EXHIBIT 1

**Bonny G. Rafel, LLC**
17 Hanover Rd. Suite ~~SUPERIOR COURT BERGEN COUNTY~~
P.O. Box 97
Florham Park, NJ 07932-0097
Phone: (973) 845-2600
Attorney for Plaintiff
BONNY G. RAFEL, ESQ.

SUPERIOR COURT BERGEN COUNTY
**FILED**
MAY 24 2016

DEPUTY CLERK

Date Filed _____
Payment # _____
CA   CK   CC   MO   CG
Amount _____
Payor _____
Batch/Ret/Case # _____

---

BERNADETTA F. MESSANA, DMD,

Plaintiff,

-vs.-

The PAUL REVERE LIFE
INSURANCE COMPANY and UNUM
GROUP,

Defendants.

SUPERIOR COURT OF NEW JERSEY
BERGEN COUNTY: LAW DIVISION
Docket No.: L-4112-16

**COMPLAINT AND JURY DEMAND**

---

Plaintiff, BERNADETTA F. MESSANA, DMD, by way of Complaint against

Defendants, hereby alleges as follows:

## PARTIES AND BACKGROUND

1.  Plaintiff Bernadetta F. Messana, DMD (hereinafter "Messana") is a resident of East

Rutherford, Bergen County, NJ.

2.  Defendant The Paul Revere Life and Accident Company (hereinafter "Paul

Revere") is a for-profit corporation organized and existing under the laws of Massachusetts.

3.  In 1992, when Messana was just out of dental school, and age 26, Paul Revere

offered her an individual disability income insurance policy marketed as "The Preferred

Professional Disability Income Policy" ("Policy").

4.  By the offer to insure her, Paul Revere made promises to Messana regarding her

entitlement to benefits in the event that she became disabled from performing the important

duties of her chosen profession under the terms of the policy.

5.     Messana detrimentally relied on the representations made by Paul Revere that the company would provide disability coverage to her in the event that she became unable to perform the important duties of her occupation.

6.     Messana justifiably relied on the specialized knowledge of the agent(s) and Paul Revere in advising her of all of the terms of the disability coverage Paul Revere was marketing for sale to her.

7.     In deciding to purchase the policy, Messana relied on the marketing and advertisement of the Paul Revere policy as protection against disability and providing financial security to individuals and their families in the time of need.

8.     Based on the representations made by Paul Revere and by its agent(s), Messana, selected Paul Revere as the disability carrier from whom she then purchased an occupation-specific disability insurance policy.

9.     Paul Revere conducted underwriting of the application for coverage and decided to issue the policy to Messana.

10.     Paul Revere issued Policy # 0102540975 (hereinafter "the Policy") to Messana effective January 9, 1992.[1]  The policy was non-cancellable and guaranteed renewable until she reached age 65 as long as she paid the premiums on the policy.

11.     The Policy provides that Paul Revere will pay a monthly benefit to Messana if she is totally disabled.  The Policy provides benefits to age 65.

12.     The Policy defines total disability as follows:

> **Total Disability** means that due to Injuries or Sickness:
>
> 1. You are unable to perform the important duties of your occupation; and

---

[1] The Paul Revere Policy is Exhibit A.

2

Complaint - 1448 Messana vs. Unum
Bonny G. Rafel, LLC

2. You are receiving Physician's care.

13.     The Policy defines "your occupation" as the occupation or occupations in which you are regularly engaged at the time disability begins.

14.     The Policy provides for monthly benefits in the sum of $2,500.00 and included Automatic Increases which Messana applied for and received three times, increasing the monthly benefit to $2,890.00 per month.   Paul Revere charged a premium for the increased benefit amount based on its scheduled rates at the time the increase was granted, but the base amount of premium would remain the same.

15.     The Policy contains a 60 day elimination period.

16.     The Policy provides for a waiver of premiums in the event of total disability.

17.     Paul Revere no longer has any employees and no longer actively markets insurance policies under its own name.

18.     Defendant Unum Group is general business corporation organized under the laws of Delaware.  Its headquarters, main administrative office and home office, principal place of business is in Chattanooga, Tennessee.  Unum Group also has corporate offices at Portland Maine, Worcester, Massachusetts and Columbia, South Carolina. Unum Group is licensed to do business in New Jersey. Unum Group acts as an insurance holding company under the insurance holding company acts of the various states, including New Jersey and under the holding company statutes is the ultimate controlling person of The Paul Revere Life Insurance Company.

19.     Individual own occupation disability insurance policies once issued by Paul Revere such as that issued to Plaintiff in this matter, are part of what Unum Group has designated as the "closed block". While incorporated in Massachusetts, Paul Revere's home

3

office is now 2211 Congress Street, Portland Maine, the same address as one of the corporate offices of Unum Group.

20.     Prior to changing its name to Unum Group in 2007, Unum Group was known as Unum Provident Corporation. Before June 30, 1999 and its merger with Unum Life Insurance Company, the entity that is now known as Unum Group and which became UnumProvident Corporation, was known as Provident Companies, Inc. In 1997 Provident Companies, Inc. acquired Paul Revere.

21.     As a general business corporation, defendant Unum Group acts as an insurance holding company under the insurance holding company acts of the various states and is ultimately the controlling entity of Defendant Paul Revere.

22.     Pursuant to its agreements with Paul Revere and other insuring subsidiaries, Defendant Unum Group is engaged in the business of insurance, performing such activities as policy administration and claims handling arising under the policies issued by Defendant Paul Revere.

23.     At all times relevant hereto, Unum Group entered into Services Agreements with its subsidiaries, including Paul Revere, wherein it agreed to provide comprehensive claims management services to administer their disability insurance claims, including reviewing the claims files, processing claims for payment and determining if claims are payable.

24.     Pursuant to its agreements with Paul Revere and other insuring subsidiaries Unum Group uses the same claim handling practices and manages claims for each insuring subsidiary on an enterprise level.

25.     As insurers and entities in the business of insurance, licensed to do business in New Jersey, defendants Unum Group and Paul Revere, their officers, directors, employees

4

Complaint - 1448 Messana vs. Unum
Bonny G. Rafel, LLC

and agents are charged with knowledge of the laws of New Jersey, more particularly those laws pertaining to the business of insurance including statutory, regulatory and common law obligations.

26.     The insurance claim of plaintiff Messana, made on a policy issued by Paul Revere in 1992, was administered by employees and/or agents of Defendant Unum Group.

27.     As a consequence of the business agreements entered into between Paul Revere and Unum Group, and the actual conduct of insurance by employees of Unum Group on the policies of Paul Revere, specifically the Messana claim, Unum Group was engaged in the business of insurance in the State of, NJ and as such, its officers, directors, agents and employees are subject to the laws and regulations of the State of NJ.

28.     The relationship between defendants Unum Group and Paul Revere is such as to make them joint venturers, a single enterprise and/or alter egos of one another regarding the administration of claims for which Paul Revere is nominally responsible.

## DISABILITY CLAIM

29.     Plaintiff Messana received her Doctor of Medicinal Dentistry, (DMD) degree on 1991 from UMDNJ, Newark, NJ. She was a self-employed dentist. In 1999 she and her husband Michael Messana, DMD, formed Hudson County Orthodontics, LLC.

30.     Plaintiff Messana's duties included working full time as a dentist performing orthodontic dental work at three dental office locations.   This includes, without limitation, performing exams, taking impressions, making dental adjustments to braces, retainer fittings, repairs.

5

31.     Beginning in 2008, Messana experienced cardiac symptoms, including chest pain and left arm pain. She consulted with a cardiologist but there was no diagnosis reached for her symptoms.

32.     Messana's symptoms worsened during long continuous dental patient care and she self-accommodated as much as possible. She continued working for the next five years 40-50 hours per week, 3.5 days per week and alternative Saturdays, seeing about 15-25 patients a day.

33.     By 2012 because symptoms shortness of breath, chest pain, irregular heartbeat, left arm pain and palpitations had increased, she came under the care of several cardiologists. She underwent testing to diagnosis the source of her atypical chest pain. Due to left shoulder pain, she had an MRI of the left shoulder in September 2012 which revealed AC joint arthropathy with bone marrow edema with posttraumatic osteolysis.

34.     Cardiac symptoms continued throughout 2012 and 2013 and she returned to the ER several times.

35.     By the fall of 2013 she came under the care of orthopedist Dr. Ghobadi, who objectively verified her joint pain, shoulder functional loss and pain and performed a cortisone steroid injection to her shoulder.

36.     By September 2013 left shoulder pain, and limitations of use of the arm, recurrent chest pain, palpitations and shortness of breath interfered so significantly with her ability to perform the important duties of her occupation as a dentist. She went to the hospital in the evening of September 23, 2013 for significant symptoms and has never been able to perform the important duties of her occupation since then.

37.     She called Unum to report her claim on October 23, 2013.

6

38.     Messana submitted all forms required by Defendants and signed an authorization permitting Defendants to independently investigate her claim.

39.     Messana indicated on Unum forms that on her last day of work, September 23rd, she worked 10 hours.  She indicated that her first symptoms occurred in 2008 and she worked until 2013. She indicated that she cannot lift her left arm, and she cannot treat patients.

40.     Messana indicated on Unum forms that she frequently stood to perform dental services, occasionally sat to perform dentistry, cannot reach for material, retract cheeks, hold instruments with her left hand, and use high speed hand pieces and other mechanical devices necessary to her practice.

41.     An MRI of the left shoulder in October 2013 revealed acromioclavicular arthropathy with edema of the distal clavicle and AC capsule, suspicion of mild adhesive capsulitis.

42.     In November, 2013 her primary doctor, Dr. Szewczyk-Szczech completed an Attending Physician Statement indicating her patient cannot work because she cannot use her left arm.

43.     In December, 2013, Messana came under the care of Rheumatologist Irina Raklyar, MD who agreed with the diagnosis of arthropathy of the left AC joint. She continues to periodically evaluate her shoulder condition, prescribing medication and treatment.

7

44.    Messana has undergone physical therapy for the left shoulder several times including during 2013 and 2014. The physical therapists consistently noted plaintiff's limitations of range of motion, immobility, the location and extent of her pain.

45.    As part of its investigation of the claim, Defendants collected and reviewed extensive medical records relevant to Messana's disability claim.

46.    As part of its investigation of the claim, Defendants searched internet databases to uncover details of Messana's background and her professional licensing.

47.    Messana cooperated fully with the investigation conducted by Defendants.

48.    Unum Director Mike Speroni ordered that Messana submit to a personal field visit by Unum investigator, Marc Lippel and noted that this was to be coordinated with secret, covert "surveillance." Defendants personally interviewed Messana on January 29, 2014 and followed her for several days, video recording her activities.

49.    The video surveillance of Messana in February 2014 did not show anything inconsistent with her reported limitations and restriction and her claim of disability.

50.    Defendants also conducted a collateral interview with an employee of Plaintiff, who confirmed Messana's schedule, her occupational duties and when she stopped working. She confirmed that she is unable to resume her occupational duties due to limited use with her left hand, limited mobility and strength of her left arm and hand, low stamina and endurance due to fatigue; palpitations and other symptoms.

51.    Defendants required Plaintiff to produce copies of office ADA procedure productions reports for 2012 and 2013. Defendants' investigation confirmed that Plaintiff Messana was performing orthodontic dental work until late September, 2013.

52.

8

53.     Treating doctors Dr. Szewczyk-Szczech and Raklyar continued to complete Attending Physician Statement (hereinafter "APS") forms designed by Defendants, on which they noted Messana's restrictions and limitations, including that she cannot use her left arm for work in her occupation, which prevents her from returning to work in her occupation.

54.     In March, 2014, Paul Revere employee, medical consultant Jay Rosenfield, PM&R reviewed medical records and questioned the restrictions and limitations in place. He then spoke with Messana's rheumatologist who confirmed that upon physical examinations there is very limited range of motion and MRIs are consistent with AC joint arthrosis. Dr. Rosenfield than confirmed that to a reasonable degree of medical certainty the insured has "significant limitations for the use of the left upper extremity.

55.     Five months after Messana had filed her claim for disability, finally Defendants approved Plaintiff's claim on April 4, 2014, finding that she was totally disabled from working in her occupation as of September 24, 2013.

56.     Just two months after approving the claim, Unum required Messana to undergo an insurance medical examination conducted by Michael Belmont MD on June 23, 2014.

57.     Dr. Belmont's physical examination revealed left shoulder impingement at 80 degrees of elevation, left shoulder mild decreased internal and external rotation, c spine mild decreased lateral rotation and lateral pending. Dr. Belmont confirmed her chronic left shoulder pain related to mild acromioclavicular joint osteoarthritis. His impression included "possible component of partial shoulder adhesive capsulitis which would be secondary to pain of mild AC osteoarthritis and consequence of decreased use of normal shoulder range of motion by patient." He opined that Messana's restrictions included "no repetitive use of

9

left arm at this time", and she was "currently limited form her occupation as pain is associated with maintaining left arm elevated above 80 degrees."

58.    Dr. Belmont suggested continued physical therapy, which Messana restarted.

59.    The office notes of treating rheumatologist Dr. Raklyar during 2014 consistently noted persist left should symptoms, muscle atrophy, tenderness over the LAC joint, pain with cross body adduction at various degrees. Dr. Raklyar continued to opine on Unum APS forms that Messana cannot carry with her left arm, and not reach above shoulder level.

60.    In 2014 Messana submitted to Defendants monthly Claimant's Statement forms whenever requested, consistently reporting her symptoms, including left shoulder pain, chest pain, palpitations, and shortness of breath.

61.    During 2014 and 2015 Messana regularly submitted to Defendants medical records and Attending Physician Statement forms completed by her treating physicians, which document her treating physicians' medical opinions regarding both her medical conditions and her disability, as well as detailing the treatment for her conditions.

62.    In January 2015, medical consultant Dr. Rosenfeld spoke with Messana's physical therapist who confirmed Messsana's regular treatment, the steady but slow progress, yet continued range of motion limitations and pain.  The physical therapist noted that Messana can do activities only at "table level or below."

63.    Despite a January 2015 recommendation by Dr. Rosenfield that restrictions and limitations are supported and the next record review should occur in two months, Unum staff instead noted that a vocational review, a "VRC" take place.

64.    The file direction continued to turn toward termination when the Mary Cloutier performed the VRC on February 3, 2015 noting that accommodations could be made in the

Complaint - 1448 Messana vs. Unum
Bonny G. Rafel, LLC

workplace, the demands of her ACE do not exceed the medically supported R&Ls and thus Messana is no longer disabled from working in her profession as a dentist.

65. Meanwhile, Messana remained under the care of rheumatologist Dr. Raklyar who she saw every three months to assess her shoulder and provide a prescription for physical therapy and pain medications. She completed an APS on March 20, 2015, noting that Dr. Messana's ongoing symptoms included "shoulder pain, palpitations, and weakness of [the] arm" and that her patient remained "unable to perform most activities for prolonged periods [with] L[eft] arm."

66. In 2015 the Attending Physician Statements and medical records provided to Defendants support Messana's symptoms and limitations resulting from her shoulder and cardiac conditions.

67. Unum required Messana to undergo a second IME with Dr. Belmont on June 9, 2015. Messana indicated that she remained unable to practice dentistry due to left shoulder pain and weakness as well as palpitations. Dr. Belmont examined Messana briefly and noted that her left shoulder "impinged at 85 degrees of elevation, left shoulder mild decreased internal and external rotation." Dr. Belmont noted "potential impairing conditions" of left acromioclavicular joint osteoarthritis, benign self –reported palpitation explained by premature atrial contractions a benign typically inconsequential cardiac dysrhythmia. In my opinion, Messana's only restriction is lifting her left shoulder above 85 degrees of elevation."

68. Dr. Belmont has no training or experience in performing a vocational analysis and his opinion that her "only restriction is lifting her left shoulder above 85 degrees of elevation" did not establish that Messana could return to perform her occupational duties.

11

Complaint - 1448 Messana vs. Unum
Bonny G. Rafel, LLC

69.     Defendants' review of the Belmont report reflects a bias designed to present facts in the light most favorable for claim denial and disregard for the factual context in which information was provided.

70.     Messana's claim was then the subject of a "TBA roundtable," a meeting to evaluate the pending claim in a conference setting to come up with ways to deny, terminate or other limit defendant's exposure to paying benefits on their policies.

71.     Unum's selected, biased, review of the claim and the conclusions drawn therefrom reflect an ongoing course of conduct grounded in established company practices to minimize medical support for a claim and focus on gathering evidence to support a denial.

72.     On July 8, 2015, Unum issued a letter terminating Plaintiff Messana's disability claim on the basis that "the information in your claim file indicates you are able to perform the duties of your own occupation and you have not returned to work."

73.     On January 13, 2016, Plaintiff Messana came under the care of Board Certified Orthopedic Surgeon, Michael F. Pizzillo.  Dr. Pizzillo has two Certificates of Added Qualifications, in Hand Surgery and Sports Medicine.

74.     On February 22, 2016, Plaintiff Messana was evaluated by Board Certified Oral/Maxillofacial Surgeon, Manolis G. Manolakakis, DMD to determine her ability to perform safe and effective dentistry on a daily basis.  His evaluation revealed that due to her medical condition, "after meticulously observing Dr. Messana perform a variety of basic functions that are required for any competent dentist, it is my opinion that since Dr. Messana does not have the full use of both of her arms, it is currently not safe for her to practice."

12

75.     On March 8, 2016, Dr. Pizzillo performed arthroscopic left shoulder surgery on Plaintiff Messana, which revealed Left shoulder adhesive capsulitis, partial-thickness rotator cuff tear and impingement syndrome.

76.     Plaintiff Messana remains under the care of Dr. Pizzillo and has been revealing rehabilitative physical therapy since March 2016 to restore function to her left shoulder.

77.     Messana remains unable to return to her occupation due to her medical condition.

78.     Defendants failed to consider and afford appropriate weight to all of Messana's impairments restrictions and limitations.

79.     Messana has fulfilled all conditions precedent to satisfy the proof of loss provision of the Policy.

80.     Defendants have consciously breached the contract by refusing to honor their contractual obligations to Messana, depriving her of the financial security they promised by marketing and issuing the insurance policy to Messana.

81.     Defendants have improperly denied Messana the monthly disability benefits for which she contracted and to which she is entitled.

82.     The activities of Defendants' claim personnel is a result of a corporate culture established by Defendants that pressures and incentivizes claim personnel to meet targets and goals for claim closures.  The targets and goals and progress toward meeting them are communicated to claims personnel.

83.     Unum Group maintains a bonus and performance evaluation system administered by Human Resources at the corporate level for all of its subsidiaries.

Complaint - 1448 Messana vs. Unum
Bonny G. Rafel, LLC

84.    Under Unum Group's incentive compensation plan, the benefits department, medical and vocational consultants and individual claims handlers are improperly incentivized to achieve corporate financial expectations. Financial expectations for the benefit department are set at the corporate level.

85.    All employees of Unum Group who administered and/or managed Messana's claim are participants in the compensation plans. One such plan is the Management Incentive Compensation and Performance Plan (hereinafter "MICP") in effect for Defendants' employees during the pendency of her claim.

86.    The MICP is an incentive plan in which all employees other than those in sales are eligible to receive incentive payment based on the performance of the company as well as their individual performance.

87.    The MICP related to individual performance includes a component that is based primarily on the individual's achievement of goals.

88.    MICP is a performance management system that includes performance and development planning, continuous feedback and performance reviews for the individual.

89.    The individual component of the MICP is based on the employee's overall performance for the year which includes an assessment of goals and the results of a "360 feedback assessment."

90.    The "360 feedback assessment" is an evaluation conducted by managers, peers, direct reports and key business partners.  As a result of the assessment, the management recommends a "contribution percentage," which is a factor of the targeted payout for the participants' position and may result in a financial reward to the participant.

91.    The MICP is based in part on Unum Group and/or Paul Revere profitability.

14

Complaint - 1448 Messana vs. Unum
Bonny G. Rafel, LLC

92.     Upon information and belief, bonuses under the MICP are usually paid out in a cash lump sum to qualifying individuals.

93.     During the years 2013-2015 employees of Defendants Unum Group who performed services related to the Messana claim received bonuses under the MICP program.

94.     During the years 2013 to present, Defendants had in place a Long Term Incentive (LTI) Plan which pays cash or stocks to certain level employees.

95.     The Long Term Incentive Plan provides rewards to participants including in-house physicians and officers of the company.

96.     Eligible employees under the Long Term Incentive Plan would be recommended to receive the awards by management.

97.     The Long Term Incentive Program was based in part on Unum Group and/or Paul Revere profitability.

98.     Upon information and belief, employees of defendants were also eligible to receive annual raises based on their performance for the prior year, based on manager recommendations.

99.     Defendants must fairly, reasonably and promptly evaluate its claim.

100.    Defendants must fairly, reasonably and promptly pay the disability claim if payment is warranted.

101.    Defendants must treat its policyholders' interests with equal regard as it does its own interests.

102.    Defendants cannot use biased consultants to assist in claim evaluation.

103.    Defendants have a duty to deal fairly and in good faith with their policyholders.

15

104.   Defendants must give equal weight to the evidence submitted by their policyholders.

105.   Defendants denied benefits based on corporate policy to find ways to terminate the benefits of insureds.

106.   Defendants' claims handling practices promote denials and terminations at the expense of the insured.

107.   The conduct of Defendants includes, without limitation, the following:

    a.   Terminating Messana's individual disability claim in 2015 without a reasonable basis and contrary to the evidence;

    b.   Attempting to reduce Defendants' liability on the Messana disability claim by knowingly conducting a biased investigation of Messana's claim;

    c.   Failing to adopt and implement reasonable standards for the proper investigation of claims;

    d.   Violating their own claim manual procedures in the handling of Messana's claim;

    e.   Terminating Messana's individual disability claim in 2015 without any evidence that her medical condition had improved from the time that they had begun paying her disability benefits;

    f.   Failing to conduct a thorough, fair and objective evaluation of Messana's medical condition before terminating her disability benefits in 2015;

    g.   Intentionally relying on biased medical reviews and a biased IME to support its pre-ordained termination of benefits in 2015;

    h.   Causing an unfounded delay in making payments;

16

s.  Compelling Messana to institute litigation to recover amounts due under the insurance Policy in violation of New Jersey Unfair Claim Practices Act;

t.  Misrepresenting pertinent facts and Policy and contract provisions relating to coverage at issue in violation of New Jersey Unfair Claim Practices Act;

u.  Failing to promptly settle this claim, when liability has become reasonably clear in violation of New Jersey Unfair Claim Practices Act;

v.  Engaging in unfair or deceptive acts and practices;

w.  Breaching Defendants' duty of the utmost fair dealing.

## FIRST COUNT - BREACH OF CONTRACT

108.  Messana repeats the allegations contained in paragraphs 1 through 107 as if set forth at length herein.

109.  Messana satisfied the proof of loss provision of the Policy from 2013 to the present for the medical conditions associated with the claim made in 2013.

110.  Defendants have failed and refused to pay Messana the disability benefits due to her from July 8, 2015 onward.

111.  Presently due and owing for the period of July 8, 2015 is a total sum of approximately $27,020.00, excluding other consequential due to Messana as a result of Defendant's violation of the duty of good faith and fair dealing and other tortuous acts described herein.

112.  Defendants acted unreasonably in the adjusting and handling of Messana's claim.

18

113.    At all relevant times Defendants breached their contractual obligations, including the contractual obligation of good faith and fair dealing, to Messana by wrongfully denying her disability benefits under its Policy.

114.    At all relevant times Defendants violated the New Jersey Unfair Claim Settlement Practices Act; which is evidence of negligence.

115.    As a result of Defendants' breach of contract, Messana has suffered contractual and consequential damages.

WHEREFORE, Plaintiff Messana demands judgment for damages against Defendants for breach of contract, together with interest, attorney's fees and costs of suit.

## SECOND COUNT - BAD FAITH

116.    Messana repeats the allegations contained in paragraphs 1 through 115 as is set forth at length herein.

117.    Defendants acted in manner to aggressively manipulate the medical evidence in the case to reduce their financial exposure on this case to the direct detriment of its insured, Messana.

118.    Defendants failed to follow their own internal guidelines in the investigation and handling of the Messana matter.

119.    Defendants knowingly acted unfairly and unreasonably in the adjusting and handling of Messana's claim.

120.    There is no debatable reason for Defendants' denial of disability benefits due to Messana for her medical conditions related to the co-morbid medical conditions which formed the basis of her claim from 2013 to the present.

19

121.    Defendants have committed the independent tort of bad faith in the handling and adjusting and ultimately denying of Messana's disability claim.

122.    As a result of Defendants' common-law bad faith violations, Messana has suffered consequential damages.

123.    Defendants' refusal to pay Messana benefits from July 8, 2015 is without any reasonable basis and contrary to the medical evidence.

124.    Defendants have acted with malice and actively plotted to deprive Messana of benefits due in order to improve their bottom line financial profitability.

125.    The handling of the Messana case evidences the institutional corporate practice of managing and eventually terminating valid disability claims to affect Defendants' bottom line.

126.    Defendants' actions in this matter are part of a company pattern and practice directed to deny valid claims to save the company from paying insureds on legitimate claims.

WHEREFORE, Plaintiff Messana demands judgment for damages against Defendants for consequential and compensatory damages together with interest, attorney's fees and costs of suit.

### THIRD COUNT - CONSUMER FRAUD ACT

127.    Messana repeats the allegations contained in paragraphs 1 through 126 as if set forth at length herein.

128.    Defendant Paul Revere's marketing, advertisement, sale, performance and administration of Policy #0102540975 is governed by the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, et seq.

Complaint - 1448 Messana vs. Unum
Bonny G. Rafel, LLC

129.    Defendants Paul Revere and Unum Group engaged in the following acts and omissions in connection with the marketing, advertisement, sale, performance and administration of Policy #0102540975, which constitute unconscionable commercial practices within the meaning of N.J.S.A. § 56:8-1, et seq.:

    a)    Misrepresenting the proofs necessary for entitlement to benefits under Policy #0102540975;

    b)    Misrepresenting and falsely advertising the terms of the Policy;

    c)    Publicizing general false information and engaging in general false advertising;

    d)    Misrepresenting pertinent facts or provisions of the Policy relating to the coverage at issue;

    e)    Intending that Messana would rely on Defendants' misrepresentation in deciding to purchase the disability policy; and

    f)    Failing to act in accordance with its representations in terms of the coverage under the policy.

130.    Defendants' conduct in connection with the marketing, advertisement, sale, performance, and administration of Policy #0102540975 is in violation of N.J.S.A. § 56:8-1, et seq.

131.    There is no direct conflict between N.J.S.A. § 56:8-1, et seq., and any other regulation governing Defendants' insurance practices.

132.    Defendants' unconscionable commercial practices in violation of N.J.S.A. § 56:8-1, et seq. have caused Messana to suffer an ascertainable loss.

WHEREFORE, Plaintiff Messana demands judgment against Defendants for treble damages pursuant to N.J.S.A. § 56:8-1, et seq., together with interest, attorney's fees, and costs of suit.

## DESIGNATION OF TRIAL COUNSEL

21

Complaint - 1448 Messana vs. Unum
Bonny G. Rafel, LLC

Pursuant to R. 4:25-4, BONNY G. RAFEL, ESQ. is designated as trial counsel.

## DEMAND FOR TRIAL BY JURY

Please take notice that Plaintiff Bernadetta F. Messana, demands a trial by jury on all

issues that are so triable.

Dated: May 20, 2016          By

BONNY G. RAFEL, ESQ.
17 Hanover Rd. Suite 410
P.O. Box 97
Florham Park, NJ 07932-0097
Phone: (973) 845-2600
Attorney for Plaintiff, Bernadetta F. Messana,

## CERTIFICATION PURSUANT TO R.4:5-1

I hereby certify, pursuant to R. 4:5-1, that the present matter in controversy is not the

subject of any other action pending in any court, nor is any other action or arbitration

proceeding contemplated, and that there are no additional parties that should be joined.

By

Dated: May 20, 2016          BONNY G. RAFEL, ESQ.

22

Complaint - 1448 Messana vs. Unum
Bonny G. Rafel, LLC